IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

WENDY TRAVER                          :

    PLAINTIFF                         : Case No. 3:16-CV-178

    v.                                :(Judge Richard P. Conaboy)

CAROLYN W. COLVIN                     :
ACTING COMMISSIONER OF
SOCIAL SECURITY ADMINISTRATION        :

    DEFENDANT                 :
_____

**Memorandum**

## I.    Background.

We consider here Plaintiff's appeal from an adverse ruling of the Social Security Administration ("Agency") dated December 3, 2015.  On that date, the Appeals Counsel approved a decision of Administrative Law Judge ("ALJ") Reana K. Sweeney that denied disability insurance benefits ("DIB") to Plaintiff.  The decision of the Appeals Counsel constitutes a "final ruling" and serves as the predicate for this Court to assert jurisdiction pursuant to 22 U.S.C. § 405g.  The parties have comprehensively briefed (Doc. 11, 13, and 14) the issues and this matter is ripe for disposition.

The ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform "sedentary work", as defined in 20 CFR 404.1567(a), with additional limitations such that: (1) she requires brief alternative position changes every 60 minutes for up to 2 minutes; (2) she can only occasionally operate foot/leg pedals

1

with her right leg, perform occasional climbing of ramps and stairs, and only occasionally, stoop, kneel and reach bilaterally overhead; (3) she must avoid climbing ropes, ladders and scaffolds and needs to avoid concentrated exposure to extreme cold, heat, humidity, fumes, dust, gases, large vibrating objects and hazardous machinery; (4) she must avoid working in high exposed places; (5) she must use a cane for balance in walking; (6) she must work in an environment where she performs only simple duties that can be learned on the job in a short time; and (7) she must avoid work at a production rate pace requiring constant pushing or pulling. (R.38).

Plaintiff asserts that she does not have the RFC determined by the ALJ but that she is functionally more limited than the ALJ found.  She contends that the ALJ's decision, as affirmed by the Appeals Counsel, errs in four ways: (1) that substantial evidence does not support the ALJ's finding that her anxiety and panic attacks are not severe impairments; (2) that the ALJ failed to accord the opinions of her treating physicians the proper deference; (3) that the ALJ's RFC assessment is not supported by substantial evidence; and (4) that the ALJ's assessment of her credibility is unsupported by substantial evidence.

## II.  **Testimony Before the ALJ.**

Plaintiff testified on August 19, 2004 that she was then 47 years of age and residing in Coaldale, Pennsylvania.  She was

2

married and her husband worked as a truck driver.  They lived with their two daughters aged 9 and 11.  Plaintiff indicated she was 5'7" tall and weighed approximately 175 pounds.  (R.60-61).

Plaintiff explained that her family did not own a dog because of her allergies and stated that she had fallen over a dog in her home in May of 2012.  When asked by the ALJ what the dog was doing in her home, she stated that the dog was a hypo-allergenic breed and that they were watching it temporarily as a favor to a neighbor.  (R.61-62).  Plaintiff testified further that she is left hand dominant and that her unemployment checks had run out in 2013. She stated that she had thought that she was capable of sedentary work until December of 2013 but, at about that time, her physical condition worsened and she no longer qualified for unemployment compensation because she was no longer available to work (R.62-64).

Plaintiff had 14 years of schooling.  She completed high school and had two years of post-graduate education - - one year of school in a licensed practical nurse curriculum and one year of school devoted to becoming a medical billing clerk.  She has earned certificates as both an LPN and a medical billing clerk.  (R.65-66).  Plaintiff explained that she had worked for Medi-source, Inc., a medical billing firm that later changed its name to Inovalon.  She worked for this firm for approximately two years. She often worked full-time hours but the company characterized her as a part-time worker for purposes of benefits.  (R.67-68).

3

Previously she had worked as a charge nurse at several extended care and assisted living facilities.  The record does not indicate how long Plaintiff worked as a charge nurse in these facilities. (R.68-69).

Plaintiff has had no mental health inpatient treatment after her onset date, September 26, 2013.  She did have a four-day mental health hospitalization in May of 2013.  She testified that she had no intensive outpatient treatment or group therapy for her depression or her panic disorder after her onset date.  The only mental health treatment she has received since her onset date came in the form of medications prescribed by her family doctor.  (R.69-71).  When asked by the ALJ why she had reneged on her promise to attend mental health therapy after her hospitalization in May of 2013, Plaintiff explained that her insurance would not cover out-of-pocket costs that she simply could not afford.  She stated that she has taken medications as prescribed by her physician for her depression and panic attacks since her May, 2013 hospitalization. Plaintiff also testified that the only reason why she hadn't sought more intensive treatment for her emotional disorders was that the cost to her would have been prohibitive.  (R.71-73).

Coincident with her onset date, Plaintiff's COPD was exacerbated when she and her family moved into a house where the prior tenant had had a dog.  This was a problem for Plaintiff because, even though the dog departed with the previous tenant, his

4

hair and dander remained in the home and badly affected her COPD, allergies and asthma.  The exacerbation she experienced was so severe that it required an emergency room visit.  The exacerbation was caused because the Plaintiff cleaned the rugs herself and was thereby exposed to a heavy dose of allergens.  Since the episode that sent her to the emergency room in December of 2013, Plaintiff has experienced constant wheezing which flares with changes in the temperature and humidity.  She uses a nebulizer at home to alleviate her breathing problem.  Her husband smokes but not in the house.  She has had no surgical procedures since September 26, 2013.  (R.73-76).

Plaintiff described her "typical day" as one where she rises at 9:30 or 10:00 a.m.  It takes her some time to "get moving" after she gets out of bed.  She usually makes breakfast for her children if they haven't already fixed themselves bowls of cereal.  She usually eats sparsely at breakfast - -typically a bagel or some cottage cheese and fruit.  She takes her morning medications after eating.  Her children dress themselves and she tends to stay in her pajamas all day.  She stays in her pajamas because they are comfortable and most days she doesn't leave the house.  She spends much of the day, 6-7 hours, watching television or reading.  She usually retires about 10:00 P.M.  (R.77-80).

Plaintiff testified that she is in constant pain in her back due to her spinal stenosis and her right leg is numb most of the

time.  At various times she has undergone physical therapy, used a TENS unit, and had epidural injections to alleviate her back pain. She has not, however, had any treatment of these types since her alleged onset of disability.  In the 2-3 months preceding her hearing Plaintiff had begun to suffer from a neurogenic bladder secondary to her back pain.  Her bladder problem requires that she use adult diapers.  She also treats for depression and COPD but has not been hospitalized for treatment of either condition.  She has not had mental health treatment of any kind since September 26, 2013, a period of at least 11 months.  (R.80-81).

Upon questioning by her attorney, Plaintiff reconsidered her previous statement that she had not been hospitalized for breathing problems after September 26, 2013.  She agreed with her attorney that her medical records reflect a hospitalization for an exacerbation of her breathing problems in December of 2013.  She described the symptoms that led up to that hospitalization as if "somebody put a pillow case over my head and tried to suffocate me."  Since December of 2013 she has been using a nebulizer at home every four hours as needed to combat her breathing difficulties. Her shortness of breath comes on quickly and from 2-3 times each week she uses the nebulizer to combat sudden symptoms.  If she was going to be out of her home for any length of time she would need to have the nebulizer with her.  (R.82-83).

Plaintiff described the symptoms of her depression as crying,

6

feelings of helplessness, feelings of being a burden to her family, and low self-esteem.  Her depression medication, Citalopram, has recently been augmented by the additional prescription of Abilify. The doctor had increased her dosage of Citalopram and added Ability because he saw a worsening of her condition.  Her doctor had just put her in touch with a psychiatrist who would "work with me payment wise."  She stated that the financial stress on her husband contributes to her anxiety and depression and that she gets panic attacks several times each week.  (R.83-84).

Plaintiff stated that she has diminished ability to walk and estimated that she could walk for no more than 10-15 minutes without resting.  She cannot stand in one place for long periods of time.  Her last employment was a sedentary job that involved sitting in one place for long periods of time.  At the time of her hearing, she stated that she finds it necessary to get up and move around every 5-10 minutes or her leg gets numb and her back pain intensifies.  In her last employment, she was required to work at her computer station for her entire shift with the exception of a half-hour break.  She testified further that her back pain, which she describes as an 8 or 9 on a scale of 1 to 10, started in her low back but seems to be moving into her mid back as well.  (R.85-86).

Paul Anderson, a Vocational Expert, also testified.  Mr. Anderson stated that he had reviewed the exhibits concerning the

claimant's work history and listened to her testimony.  He also stated that he was familiar with the Dictionary of Occupational Titles and the characteristics of various occupations.  Mr. Anderson was asked to make a series of assumptions regarding Plaintiff's work capacities by the ALJ.  Each assumed an individual the same age as the Plaintiff with identical education and work history.

The first hypothetical assumed an individual who could perform the full range of unskilled work with additional limitations including: (1) sedentary exertional capacity; (2) a sit/stand option; (3) the ability to change position for approximately two minutes once each hour; (4) right lower extremity limited to only occasional use of pedals or levers; (5) occasional climbing of ramps or stairs; (6) no climbing of stairs or scaffolds; (7) stooping to waist level and kneeling only occasionally; (8) no crouching, crawling or squatting; (9) reaching overhead only occasionally; (10) no concentrated exposure to extreme cold or heat, humidity, fumes, dust, gases, or poor ventilation; (11) no exposure to large vibrating objects, high exposed places, or fast moving machinery; (12) a work environment limited to simple duties that can be learned on the job in a short period of time; and (13) avoidance of a production pace requiring constant pushing and pulling.  Having listened to this hypothetical question, Mr. Anderson indicated that there were five jobs that existed in

8

significant numbers in the national economy that Plaintiff could perform.  These jobs were: call out operator, food and beverage order clerk, surveillance system monitor, parking machine operator, and a variety of machine tender positions.  The vocational expert added that he was basing his opinion that a person with an RFC assumed by the hypothetical questions could perform the occupations identified as long as permitted to take "normal breaks".

Upon questioning by Plaintiff's attorney, the vocational expert was asked to assume the same hypothetical RFC and to also assume that such a person would also miss two days of work each month because of COPD exacerbations or pain.  Presented with this scenario, the vocational expert stated that this level of absenteeism would not be tolerated.  The vocational expert was then asked to assume all limitations outlined by the ALJ plus the need to be off task about 20% of the work day due to Plaintiff's conditions.  The vocational expert stated that a person with those limitations could not perform any substantial gainful activity. (R.87-94).

**III. Medical Evidence.**

**a.   Dr. Backenstoes.**

Dr. Jeffrey J. Backenstoes, D.O., was Plaintiff's primary treating physician from at least July of 2011 through April of 2013.  On July 5, 2011 Dr. Backenstoes examined Plaintiff and found her to be suffering from spinal stenosis, depressive disorder NOS,

generalized anxiety disorder, lower leg joint pain and insomnia. (R.304).   In August of 2011 Plaintiff returned to Dr. Backenstoes who documented that Vicodin was not providing Plaintiff the desired pain relief.   Dr. Backenstoes then changed Plaintiff's pain medication substituting Oxycodone for the Vicodin.   (R.317).

In November of 2011 Plaintiff returned to Dr. Backenstoes with complaints of coughing and shortness of breath. Despite these complaints her respiratory examination was normal.  Dr. Backenstoes diagnosed acute sinusitis and acute bronchitis and prescribed antibiotics.  Plaintiff returned to Dr. Backenstoes in February and August of 2012 with symptoms of coughing and shortness of breath. On both these occasions, Dr. Backenstoes prescribed antibiotics and recommended that Plaintiff stop smoking.  On both occasions, Dr. Backenstoes noted that Plaintiff displayed "no signs of apparent distress" and, while she had "moderately decreased air flow, she displayed "no crackles, rales, or ronchi" in her lungs bilaterally. (R.332-33 and 358-59).

Dr. Backenstoes also completed two medical source statements assessing Plaintiff's physical capacities.  These were prepared four months apart on December 20, 2012 and April 29, 2013.  The report of December 20, 2012 indicated that Plaintiff:  could occasionally lift up to ten pounds; walk one to two hours in an eight-hour day; sit less than six hours in an eight-hour day and never more than one hour at a time; required a sit/stand at will

option; could bend and kneel only occasionally; was not impaired in terms of handling, fingering, feeling, and speaking; and would be badly affected by a wide array of environmental factors due to her COPD. (R.494-95).

Dr. Backenstoes once again did a functional capacity evaluation of Plaintiff on April 28, 2013.  His assessment on this occasion was more dire.  He stated that Plaintiff: was not a malingerer; that her depression affected her physical condition; that her pain was severe enough to "constantly" interfere with the attention and concentration required to perform even simple tasks; that she was emotionally incapable of performing even low-stress jobs; that she could sit for no more than ten minutes; that she could not stand at all in one place; that she could sit for less than two hours in an eight-hour day; that she could stand/walk for less than two hours in an eight-hour day; that she must be allowed to walk for one to two minutes at least five times in an eight-hour day; that she was precluded from ever lifting anything; that she would need unscheduled breaks every 15-20 minutes of 15-20 minutes duration during an eight-hour day; that she could never stoop or crouch; and that her impairments would cause her to miss more than four workdays each month.  The record contains no indication that Dr. Backenstoes saw Plaintiff in the time between his two significantly different physical capacities evaluations.

**b.    Dr. Olufade.**

Dr. Olusen Olufade saw Plaintiff for a consultative examination on January 5, 2013.  Dr. Olufade found that Plaintiff had an antalgic gait and walked with the assistance of a cane.  He noted no shortness of breath but indicated all sectors of her lungs were positive for wheezing.  He found her thought processes to be logical and linear.  She exhibited grossly intact motor strength in all extremities but for her right ankle due to a poorly healed fracture suffered in 1991.  Her straight leg raise test was negative.  Her sensitivity to light touch was intact.

Dr. Olufade noted Plaintiff's history of lumbar stenosis but also noted that she had taken no recent conservative treatment such as physical therapy.  Based on his evaluation he concluded: Plaintiff could stand or walk for one to two hours in an eight-hour day; could sit up to eight hours in an eight-hour workday; could lift or carry occasionally 10 to 20 pounds; had no manipulative limitations; had postural limitation in that she could not bend, stoop, crouch, or squat frequently.  Had no limitation on her ability to communicate; and used an assistive device for walking. (R.503-506).

**c.   Dr. Gilbert.**

Dr. Richard Gilbert became Plaintiff's treating physician in November of 2013.  On November 11, 2013, Plaintiff presented with complaints of urinary frequency and cold symptoms.  Dr. Gilbert's notes indicate Plaintiff had a history of COPD.  She presented with

no anxiety, depression, or emotional problems.  Dr. Gilbert also took note of Plaintiff's history of spinal stenosis.  His examination revealed that Plaintiff's blood pressure was 102/74 and oxygen saturation level was 97%.  He found her to be in no acute distress in terms of her respiration and found that she exhibited a normal gait.  (R.793-797).

On December 10, 2013, Plaintiff presented to Dr. Gilbert with complaints of shortness of breath and insomnia.  He administered two Albuterol treatments and gave her an injection of Dopomedrol. Before she left his office her wheezing had resolved and she indicated that she was breathing better.  He prescribed antibiotics and gave her samples of Spiriva and Advair.  She was instructed to go to an emergency room if she experienced worsening respiratory symptoms.  (R.789-793).

On December 23, 2013, Plaintiff presented for a follow-up examination after undergoing hospitalization from December 11, 2013 through December 17, 2013 for an acute exacerbation of her COPD. In addition to her COPD, Dr. Gilbert noted anxiety, depression, and spinal stenosis. Dr. Gilbert found that Plaintiff was "currently asymptomatic", and updated her medications.  (R.787-88).

On March 18, 2014, Plaintiff presented with a principal complaint of chronic back pain.  Plaintiff had no complaints of a respiratory nature at this time.  Her orientation, mood, and affect were normal.  Dr. Gilbert updated her medication for muscle spasms

13

and stated that he would attempt to obtain pre-authorization for a Butrans patch.  (R.783-787).

Plaintiff next saw Dr. Gilbert on April 22, 2014.  He found her to be doing "reasonably well" and described her breathing as "well-controlled".  Dr. Gilbert updated her prescriptions for Oxycodone (for pain due to spinal stenosis) and Carisoprodol (for muscle spasms).  (R.779-782).

On May 22, 2014 Plaintiff presented with complaints related to her chronic problems of back pain and COPD.  Dr. Gilbert's notes indicate that she had improved pain control with a Butrans patch and that she was breathing well.  Her gait and station were normal as were her orientation, mood and affect.  She displayed no significant respiratory distress.  (R.774-778).

Plaintiff next saw Dr. Gilbert on August 18, 2014.  Dr. Gilbert noted that her pain was well-controlled on her current regimen and continued her on those medications.  Dr. Gilbert also noted that Plaintiff's anxiety was not under good control and added Abilify to lessen her anxiety.  Dr. Gilbert noted: "I do not feel that she is capable of working secondary to the chronic back pain and COPD symptoms."  However, Dr. Gilbert's physical examination on that date revealed "no increased work of breathing or signs of respiratory distress" and indicated further that Plaintiff was not in acute distress and that her gait and station remained normal. (R.806-810).

On September 11, 2014, Dr. Gilbert saw Plaintiff once again. She was seen in follow-up of her chronic anxiety and respiratory problems.  She stated that she was doing well and that the Abilify was helpful.  She also indicated that her breathing was well-controlled and that she was capable of being more active and sleeping better.  Dr. Gilbert's physical examination disclosed no shortness of breath or respiratory distress and that her lungs were clear to auscultation.  Once again, her gait and station were normal.  Her mood and affect were normal and improved in relation to previous visits.  (R.801-805).

On August 10, 2014, Dr. Gilbert completed a functional capacity questionnaire regarding Plaintiff.  Dr. Gilbert identified findings of lumbar tenderness, lumbar paraspinal tenderness and spasm, dyspnea, wheezing, chronic low back pain, and lumbar radiculopathy.  He stated that Plaintiff's medications produce nausea and drowsiness, and that her depression and anxiety affect her present condition.  He opined that Plaintiff was incapable of performing even low stress jobs.  He also indicated that Plaintiff could sit for no more than two hours in an eight-hour workday and never longer than 30 minutes at a time.  Dr. Gilbert opined further that Plaintiff could stand/walk for no more than two hours in an eight-hour workday.  He indicated also that she would need 3-4 of unscheduled breaks of 15 minutes duration during and eight-hour workday and that she would likely miss work for more than four days

per month.  (R.49-52).

###### d.   Dr. Nolan.

In January 2013, James Nolan, Ph.D., performed a psychological evaluation of Plaintiff at the request Bureau of Disability Determination.  Dr. Nolan found Plaintiff "somewhat unanimated" yet "alert, properly oriented, and verbally productive."  He described her mood as "depressed with grim, unvaried affect."  Dr. Nolan stated that Plaintiff has abstract reasoning ability but is slow to perform simple mental calculations.  Her recent recall was good and Dr. Nolan thought her to be of average intelligence.  He described her impulse control as "intact" and her social judgement as "fair".  Dr. Nolan found that Plaintiff "presents as a reliable source of information."

Dr. Nolan diagnosed dysthmic disorder, panic disorder without agoraphobia, and obsessive-compulsive disorder.  Nonetheless, he concluded that "She (Plaintiff) appears able to perform satisfactorily in employment consistent with her experiences and suitable for her physical limitations."  Dr. Nolan found that Plaintiff had none to only slight limitations understanding and carrying out both simple and detailed instructions and in making judgements on simple work-related decisions.  In terms of her ability to interact appropriately with the public, co-workers and supervisors and her ability to respond appropriately to usual work pressures, Dr. Nolan opined that Plaintiff would be impaired at

"moderate to marked levels" in these areas.  Finally, Dr. Nolan indicated that Plaintiff was capable of managing benefits in her own best interest.

**IV.  ALJ Decision.**

The ALJ's decision (Doc. 9-2 at 30-48) was unfavorable to the Plaintiff.  It included the following findings of fact and conclusions of law.

1.  The claimant meets the insured status requirements of the Social Security Act through June 30, 2016.

2.  The claimant has not engaged in substantial gainful activity since September 26, 2013, the alleged onset date.

3.  The claimant has the following severe impairments: degenerative disc disease, spinal stenosis, MOS, dysthymia, and chronic obstructive pulmonary disease.

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1, (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.  After careful consideration of the entire

17

record, the undersigned finds that the claimant has a residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except she requires brief alternating positions every 60 minutes, for up to two minutes, before resuming the former position.  The claimant can occasionally operate foot/leg pedals with her right lower extremity, perform occasional climbing ramps/stairs, occasional stooping, kneeling and bilateral reaching overhead.  The claimant needs to avoid climbing rope, ladder and scaffolding, crouching and crawling, and needs to avoid concentrated exposure to extreme cold, heat, humidity, wet/water/liquids, fumes, dust, gases, poor ventilation, large vibrating objects, working around hazardous machinery, working in high exposed places, and working around large fast-moving machinery on the ground, with sharp objects or with toxic or caustic chemicals.  The claimant requires the use of a cane for ambulation and balance following ankle surgery.  The claimant retains the mental capacity for simple duties that can be learned on the job in a short period and

should avoid work at a production rate pace
requiring constant pushing or pulling of
materials.

6.  The claimant is unable to perform any past
relevant work.

7.  The claimant was born on May 18, 1967 and was
44 years old, which is defined as a younger
individual age 45-49, on the alleged disability
onset date.

8.  The claimant has at least a high school
education and is able to communicate in
English.

9.  Transferability of job skills is not material
to the determination of disability because
using the Medical Vocational Rules as a
framework supports a finding that the claimant
is "not disabled," whether or not the claimant
has transferable job skills.

10.  Considering the claimant's age, education, work
experience, and residual functional capacity,
there are jobs that exist in significant
numbers in the national economy that the
claimant can perform.

11.  The claimant has not been under a disability,

as defined in the Social Security Act, from

September 26, 2013, through the date of this

decision.

## V.    Disability Determination Process.

The Commissioner is required to use a five-step analysis to

determine whether a claimant is disabled.[1]  It is necessary for the

Commissioner to ascertain: 1) whether the applicant is engaged in a

substantial activity; 2) whether the applicant is severely

impaired; 3) whether the impairment matches or is equal to the

requirements of one of the listed impairments, whereby he qualifies

for benefits without further inquiry; 4) whether the claimant can

perform his past work; 5) whether the claimant's impairment

together with his age, education, and past work experiences

preclude him from doing any other sort of work.  20 CFR §§

404.1520(b)-(g), 416.920(b)-(g); *see Sullivan v. Zebley*, 493 U.S.

---

[1]  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less that 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).  The Act further provides that an individual is disabled

only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

521, 110 S. Ct. 885, 888-89 (1990).

The disability determination involves shifting burdens of proof.  The initial burden rests with the claimant to demonstrate that he or she is unable to engage in his or her past relevant work.  If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform.  *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

As set out above, the instant decision was decided at the fifth step of the process when the ALJ found there are jobs that exist in the national economy that Plaintiff is able to perform. (R.44).

**VI. Standard of Review**

This Court's review of the Commissioner's final decision is limited to determining whether there is substantial evidence to support the Commissioner's decision.  42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).  The Third Circuit Court of Appeals further explained this standard in *Kent v. Schweiker*, 710 F.2d 110 (3d Cir. 1983).

This oft-cited language is not . . . a

21

talismanic or self-executing formula for
adjudication; rather, our decisions make
clear that determination of the existence *vel
non* of substantial evidence is *not* merely a
quantitative exercise.  A single piece of
evidence will not satisfy the substantiality
test if the Secretary ignores, or fails to
resolve, a conflict created by countervailing
evidence.  Nor is evidence substantial if it
is overwhelmed by other evidence--
particularly certain types of evidence (e.g.,
that offered by treating physicians)--or if
it really constitutes not evidence but mere
conclusion.  *See Cotter*, 642 F.2d at 706
("Substantial evidence" can only be
considered as supporting evidence in
relationship to all the other evidence in the
record.") (footnote omitted).  The search for
substantial evidence is thus a qualitative
exercise without which our review of social
security disability cases ceases to be merely
deferential and becomes instead a sham.

710 F.2d at 114.

This guidance makes clear it is necessary for the Secretary to analyze all evidence.  If she has not done so and has not sufficiently explained the weight given to all probative exhibits, "to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979).  In *Cotter*, the Circuit Court clarified that the ALJ must not only state the evidence considered which supports the result but also indicate what evidence was rejected: "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter*, 642 F.2d at 706-07.  However, the ALJ need not undertake an exhaustive discussion of all the evidence.  *See*, *e.g.*, *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).  "There is no requirement that the ALJ discuss in its opinion every tidbit of evidence included in the record."  *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004).  "[W]here [a reviewing court] can determine that there is substantial evidence supporting the Commissioner's decision, . . . the *Cotter* doctrine is not implicated."  *Hernandez v. Commissioner of Social Security*, 89 Fed. Appx. 771, 774 (3d Cir. 2004) (not precedential).

23

A reviewing court may not set aside the Commissioner's final decision if it is supported by substantial evidence, even if the court would have reached different factual conclusions.  *Hartranft*, 181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . .").  "However, even if the Secretary's factual findings are supported by substantial evidence, [a court] may review whether the Secretary, in making his findings, applied the correct legal standards to the facts presented."  *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983) (internal quotation omitted).  Where the ALJ's decision is explained in sufficient detail to allow meaningful judicial review and the decision is supported by substantial evidence, a claimed error may be deemed harmless.  *See*, *e.g.*, *Albury v. Commissioner of Social Security*, 116 F. App'x 328, 330 (3d Cir. 2004) (not precedential) (citing *Burnett v. Commissioner*, 220 F.3d 112 (3d Cir. 2000) ("[O]ur primary concern has always been the ability to conduct meaningful judicial review.").  An ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or her decision.  *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001).

**VII. Discussion.**

**A. General Considerations**

24

At the outset of our review of whether the ALJ has met the substantial evidence standard regarding the matters at issue here, we note the Third Circuit has repeatedly emphasized the special nature of proceedings for disability benefits. *See Dobrowolsky*, 606 F.2d at 406. Social Security proceedings are not strictly adversarial, but rather the Social Security Administration provides an applicant with assistance to prove his claim. *Id.* "These proceedings are extremely important to the claimants, who are in real need in most instances and who claim not charity but that which is rightfully due as provided for in Chapter 7, Subchapter II, of the Social Security Act." *Hess v. Secretary of Health, Education and Welfare*, 497 F. 2d 837, 840 (3d Cir. 1974). As such, the agency must take extra care in developing an administrative record and in explicitly weighing all evidence. *Dobrowolsky*, 606 F.2d at 406. Further, the court in *Dobrowolsky* noted "the cases demonstrate that, consistent with the legislative purpose, courts have mandated that leniency be shown in establishing the claimant's disability, and that the Secretary's responsibility to rebut it be strictly construed." *Id.*

**B.    Plaintiff's Allegations of Error.**

Plaintiff asserts that the agency made four errors that require a remand of this case for further proceedings. We shall consider these in the order presented.

**1.    Whether Substantial Evidence Supports the ALJ's Findings**

25

**at Step 2?**

At Step 2 of the agency's evaluative process the ALJ must determine whether the claimant has a medically severe impairment. Bowen v. Yuckart, 482 U.S. 137, 140-41 (1987).  Indeed, in this case, the ALJ identified four severe impairments: degenerative disc disease; spinal stenosis, NOS; dysthmia[2]; and chronic obstructive pulmonary disease.  (R.35).  The Plaintiff's quarrel with the ALJ's reasoning is that she did not identify Plaintiff's panic attacks as a severe impairment.

In discussing Plaintiff's psychiatric status, the ALJ did note that she had undergone a psychiatric hospitalization in May of 2013 (some four months prior to her alleged onset date) but that she was discharged four days later in stable condition.  The ALJ could not comment further because the record discloses no further in-patient psychiatric hospitalizations or even the results of any sessions with any treating psychiatrist or psychologist.  The record does not demonstrate that the Plaintiff's panic attacks occur with such frequency to be disabling or that they had continued unabated for at least one year as required by the agency's regulations.

Step 2 of the Commissioner's five-step sequential evaluation process "is a threshold analysis that requires (the claimant) to show that he has one sever impairment" Bradley v. Barnhart, 178

---

[2] Dysthmia is a mild but chronic form of depression.  See National Library of Medicine, ncbi, nlm, nih.gov/pubmedhealth.

F.App'x 87, 90 Seventh Circuit 2006); See also De Sando v. Astrue, 2009 WL 890940 (M.D. Pa., March 31, 2009).  Because the ALJ found here that Plaintiff had multiple severe impairments, her determination that Plaintiff's panic attacks were not severe is no more than harmless error at Step 2 and thus irrelevant.  Salles v. Commissioner of Social Security, 229 F.App'x 140, 145 at n.2 (3d. Cir. 2007).  So long as a claim is not denied at Step 2 and the ALJ accounts for all impairments, severe and non-severe, in assessing Plaintiff's residual functional capacity, it is insignificant if the ALJ does not find any particular impairment to be severe. Bliss v. Astrue, 2009 WL 413757 (W.D. Pa., February 18, 2009). Here the ALJ reasonably allowed for Plaintiff's alleged panic attacks (which are documented only by Dr. Nolan in relation to his one session with the Plaintiff some nine months before her alleged onset date) by limiting her RFC to jobs requiring only the performance of simple duties that could be easily learned and involve only a  modified production pace.  Accordingly, this Court finds that the Plaintiff's RFC reflected all her impairments, severe and non-severe.  More than that is not required.  See Richards v. Astrue, 2010 WL 2606523 at 5(W.D. Pa., June 28, 2010)(citing Lewis v. Astrue, 498 F.3d 909, 911 (9th Cir. 2007)). Thus, the ALJ's conclusion that Plaintiff's panic attacks were non-severe at Step 2 of the evaluative process cannot constitute error because this case was ultimately evaluated appropriately through

Step 5 of the process the agency must observe.

2. **Whether the ALJ Failed to Properly Evaluate the Testimony of Plaintiff's Treating Physicians?**

There is no doubt that the testimony of a treating physician is normally entitled to great deference under the caselaw of this circuit. The opinions of treating physicians are entitled to great weight, particularly when based upon a lengthy doctor/patient relationship as in the case before us.[3] Morales v. Apfel, 225 F.3d 310, 317 (3d. Cir. 2000). When the treating physicians' opinions conflict with a non-treating source, the ALJ may choose whom to credit in his or her analysis, but "cannot reject evidence for no reason or the wrong reason." An ALJ is categorically precluded from making an RFC determination that contradicts a treating physician's opinion in the absence of medical evidence that contradicts the treating physician's conclusion. Doak v. Heckler, 790 F.2d 26, 29 (3d. Cir. 1986). To do this would be to make a RFC determination that is unsupported by substantial evidence and, thus, void. Diller v. Acting Commissioner of Social Security, 962 F.Supp 2d. 761, 769 (W.D.Pa. 2013). In light of this caselaw, the question that must be answered is whether the record contains medial evidence that refutes the opinions of treating physicians

---

[3] Plaintiff treated multiple times over a period of years with both Drs. Backenstoes and Gilbert.

Backenstoes and Gilbert that Plaintiff is completely disabled.

The ALJ observes that Dr. Backenstoes provided two opinions regarding Plaintiff's RFC.  The first of these (Ex. 8F) in December of 2012 could reasonably be read to indicate that Plaintiff's RFC was well within the capacities the ALJ ultimately ascribed to Plaintiff.  The second opinion (Ex. 9F) provided by Dr. Backenstoes in April of 2013 describes her as completely disabled due to exacerbated COPD and severe, unrelenting back pain.  The ALJ compared Dr. Backenstoe's April 2013 functional capacity assessment with his April 2013 office notes concerning the Plaintiff and found that the two were inherently inconsistent.  Our review of the office notes for April 29, 2013 persuades this Court that the ALJ had good reason to attach little weight to Dr. Backenstoes's April 2013 functional capacity assessment because his office notes at that time (R.551-553) make no mention of severe unrelenting pain or any exacerbation of Plaintiff's breathing problems.  In fact, the notes indicate that Plaintiff showed no signs of apparent distress, was awake and oriented, that her respiration rate was normal, her lungs clear, and that Dr. Backenstoes heard no crackles, rales, ronchi, or wheezes from Plaintiff's lungs bilaterally upon examination on that date.  In short, the ALJ correctly observed that Dr. Backenstoes' April 29, 2013 office notes and his April 2013 functional capacity assessment of Plaintiff were internally inconsistent and, as such, entitled to little weight.  The Court

cannot disagree.

Another treating physician, Dr. Gilbert, saw Plaintiff on eight separate occasions between January 2013 and May 2014.  While his notes of these visits do posit back pain and respiratory difficulties, they also state repeatedly that Plaintiff presented with normal gait and station, that Plaintiff presented multiple times in no acute distress, that her breathing problems were well controlled by her medications, that her back pain was well-controlled by her pain medications, and, on May 18, 2014, that she exhibited no respiratory distress and that her mood and affect were "normal and improved".  Then, in August of 2014, Dr. Gilbert completed a functional capacity evaluation that indicated that Plaintiff's physical and emotional problems were so serious as to be utterly disabling.  This opinion stood in sharp contrast to the progress notes previously authored by Dr. Gilbert over the preceding 19 months.  Moreover, Dr. Gilbert provided no explanation of how or why claimant's condition had deteriorated so abruptly. Due to this seeming disconnect and inconsistency, the ALJ was certainly within her prerogative to assign little weight to Dr. Gilbert's opinion.[4]

---

[4] We note that Plaintiff's primary brief criticized the ALJ for not explicitly commenting on Dr. Gilbert's functional capacity evaluation of August of 2014.  The agency's brief asserted, properly, that Dr. Gilbert's opinion had not been placed before the ALJ despite the fact that it was prepared before Plaintiff's hearing took place.  In her reply brief, Plaintiff does not even attempt to refute the agency's argument that, because Dr. Gilbert's opinion was not new or material and that Plaintiff had presented no good cause for not bringing it to the ALJ's attention earlier, the Court

Having fairly considered the medical evidence provided by the treating physicians, the Court finds that it was internally inconsistent to an extent that it deprives those opinions of the deference which would normally be accorded such evidence.  The Plaintiff's argument that the treating physicians' opinions were not given the deference to which they were entitled must be rejected.

3.     **Whether Substantial Evidence Supports the ALJ's RFC Assessment?**

Plaintiff asserts that the ALJ's RFC assessment is unsupported by substantial evidence for two reasons: (1) that the ALJ's hypothetical question to the vocational expert did not adequately account for her difficulties with concentration, persistence, and pace; and (2) that the ALJ's hypothetical question to the vocational expert did not sufficiently account for the erosion of the occupational base due to her need to use a cane.  With respect to the issue of Plaintiff's difficulties with concentration, persistence, and pace, the ALJ's hypothetical question included assumptions that the Plaintiff's work would be confined to tasks requiring "the mental capacity for simple duties that can be

---

should not remand this matter for consideration of Dr. Gilbert's report.  The Court finds that the agency's argument is correct in this regard and we will not fault the ALJ for not commenting upon something she had not seen.  We find also, having considered Dr. Gilbert's report, that it, like Dr. Backenstoes report of April 2013, was inconsistent with the patient's history as recorded in treatment notes and, as such, would not have altered the ALJ's opinion.

learned on the job in a short period and should avoid work at a
production rate/pace requiring constant pushing or pulling of
materials." (R.38). The Court cannot agree that Plaintiff's
difficulties with concentration, persistence, and pace are not
addressed by the ALJ's stipulation that she perform only simple
duties at a modified production rate. The Court has reviewed cases
cited by the Plaintiff for the proposition that limiting a claimant
to low-stress jobs requiring only simple, repetitive tasks and
occasional contact with the public and co-workers does not satisfy
the ALJ's obligation to account for difficulty with concentration,
persistence, and pace. However, we find that the hypothetical
question in this case was more comprehensive than those asked in
the cases cited by Plaintiff in that it also included limitations
regarding the pace at which the Plaintiff could work. Thus, the
Court finds that the ALJ's hypothetical question to the vocational
expert adequately accounted for Plaintiff's difficulties with
concentration, persistence and pace.

Plaintiff's other argument, that the ALJ failed to consider
the erosion of the occupational base caused by her use of a cane,
must also be rejected. The record demonstrates that the ALJ's RFC
assessment included allowance for use of a cane. (R.38).
Moreover, the vocational expert explicitly testified that the use
of a cane was irrelevant to the performance of sedentary work.
(R.91). Thus, the vocational expert necessarily accounted for any

32

erosion of the occupational base caused by Plaintiff's cane use by stating that it was irrelevant given the ALJ's specific instruction that Plaintiff was limited to sedentary work.  Consequently, Plaintiff's argument on this point fails.

    **4.   Whether Substantial Evidence Supports the ALJ's Credibility Assessment?**

    Credibility determinations are the province of the ALJ and should ordinarily be accorded deference by the reviewing court. Reefer v. Barnhart, 326 F.3d 376, 380 (3d. Cir. 2003).  Those medical conditions that are established in the record and can reasonably be expected to produce the symptoms of which Plaintiff complains must be evaluated by the ALJ in terms intensity and persistence in order to determine the claimant's functional abilities.  (20 CFR § 404.1529).  The specific focus of Plaintiff's argument here is that the ALJ improperly discounted her complaints as to the severity and intensity of her back pain.

    The ALJ did acknowledge that Plaintiff's medically determinable impairments (spinal stenosis and degenerative disc disease) could reasonably be expected to cause her physical pain. But the ALJ also found that Plaintiff's description of the intensity and persistence of this pain are not entirely credible. (R.39).  The ALJ's reasoning in rejecting Plaintiff's subjective complaints of pain is based upon x-rays revealing no acute fracture or subluxation, the persistent documentation by her physicians that

she presented for numerous visits over a period of several years with "normal gait and station", a general lack of documentation of intense pain in her physicians' progress notes, her failure to undergo diagnostic testing or physical therapy, and her own accounts regarding the level of her daily activities.  (R.40-41). These factors, taken in combination, provide the requisite basis to find that the ALJ's credibility determination is supported by substantial evidence; that is, while it may not amount to a preponderance of the evidence, it comprises "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  (See Richardson v. Perales, supra.).  Accordingly, the Court finds that the ALJ's credibility determination will not be disturbed.

## VIII. Conclusion.

Consistent with the foregoing analysis, each of Plaintiff's assignments of error will be rejected.  An Order consistent with this determination will be filed contemporaneously.


BY THE COURT


                                    S/Richard P. Conaboy
                                    Honorable Richard P. Conaboy
                                    United States District Court


Dated: October 3, 2016